Norman KULP, Petitioner

v.

Franklin TIMMONS, both individually and as sole surviving Trustee pursuant to a purported Joint Irrevocable Living Trust Agreement dated January 11, 1985 d/b/a/ Timmons Boatyard, and Beverly Timmons, as purported successor Trustee to Franklin Timmons, Respondents.

C.A. No. 1946–S.

Court of Chancery of Delaware,
Sussex County.

Submitted: March 6, 2002.
Decided: July 30, 2002.

David A. Boswell, Esquire of Schmittinger & Rodriguez, P.A., Rehoboth Beach, DE, for Petitioner.

Craig A. Karsnitz, Esquire of Young Conaway Stargatt & Taylor, LLP, Georgetown, DE, and Eric C. Howard, Esquire of Wilson Halbrook & Bayard, Georgetown, DE, for Respondents.

## OPINION

JACOBS, Vice Chancellor.

Pending are cross motions for summary judgment in this action brought by the petitioner, Norman Kulp ("Kulp"), in aid of execution upon a judgment entered in Kulp's favor in a workers' compensation action. The respondent, Franklin Timmons, Sr. ("Timmons"), defends on the ground that he has no assets that can respond to the judgment because he previously conveyed all of his property to a spendthrift trust of which he (Timmons) is presently the settlor, trustee and (during his lifetime) the sole beneficiary. In this action, Kulp seeks to have the spendthrift trust set aside and declared void, or alternatively, declared unenforceable as to himself. If granted, that relief would enable Kulp to execute upon the trust property. Timmons opposes these claims, and has cross-moved for summary judgment of dismissal based on the defense of laches.

For the reasons discussed below, Kulp's motion for summary judgment will be granted, and Timmons' cross motion will be denied.

## I. THE FACTS

The parties agree that this dispute involves solely issues of law, and they have submitted their motions based upon the following stipulated facts.[1]

### A. Background

Before 1985, Timmons and his wife, Kathryn ("Kathryn"), owned property adjacent to Pepper Creek in Sussex County,

---

1. Pretrial Stipulation ("Stip.") ¶ 70.

Delaware. The property included farmland, the Timmons' residence, and a marina called the "Boatyard" where Timmons operated the family business. The above-described land was the only real property that Timmons owned, and was the only capital asset that supported the family business. Timmons' primary income was derived from the Boatyard.[2]

At the Boatyard, Timmons rented out boat slips, assessed dry dock fees, maintained and repaired boats, and performed the day-to-day operations of the marina. Despite these activities, the Boatyard (Timmons contends) operated at a loss. Timmons was unable to document that contention, however, because the Boatyard records—which his daughter-in-law Beverly maintained—include little information about the income (if any) generated from the maintenance and repair of customers' boats.[3]

In 1977, Timmons was sued by Charles J. Cannon on transactions that involved the Boatyard. Cannon was awarded a $7,700 judgment against Timmons in 1980. Claiming that he lacked sufficient funds, Timmons never paid the judgment.[4] With the Cannon judgment still outstanding, and without any improvement in their financial circumstances, Timmons and Kathryn established a Joint Irrevocable Living Trust on January 11, 1985 (the "Trust"). Timmons and Kathryn conveyed to the Trust the farm and the Boatyard, which comprised all the real property that they owned and the only significant assets that were capable of responding to a creditor judgment.[5]

Under the terms of the Trust, Timmons, Kathryn and their son, Franklin Thomas, Jr. ("Jimmy"), were named as trustees. The Trust instrument gave trustees discretion to invade the trust principal and to sell the land for their own benefit.[6] Although his property was now held by the Trust, Timmons never viewed the Trust as limiting his ability to use the land for himself or to rent it to others. Timmons believed that he could continue to live on the land, operate his business on it, and use the land as his own, as he had done in the past, which, in fact, is what Timmons did.[7]

Two additional documents were executed in connection with the Trust instrument. The first was a partnership agreement ("Partnership Agreement"), which created a partnership between Timmons and his son, Jimmy, for the purpose of operating the Boatyard. The Partnership Agreement identified Kathryn and Jimmy—but not Timmons—as partners.[8] The second document was a lease that called for the payment of a monthly rent for using the Boatyard, but left the specific rental amount blank. Although it was understood that the rental amount would be inserted after Timmons secured an appraisal of the Boatyard's fair market value,

---

2. Timmons also engaged in limited farming of the land, from which the family essentially "broke even." *Id.* ¶ 16; B. Timmons Dep. at 16.

3. Stip. ¶¶ 11–16, 24–29.

4. *Cannon v. Timmons*, C.A. No. 77–0C11, 1979 WL 193334 (Del.Super.Ct. Jan. 19, 1979); Stip. ¶ 17.

5. Timmons Dep. at 109; Slip. ¶ 23.

6. Stip. ¶¶ 18–22. The Trust instrument provided that the settlors had the right to "re-

ceive all Trust income during their joint lifetimes." In addition, it specified that Timmons' assets would be placed into two separate Trusts: the "Family Trust" and the "Survivor's Trust." In this Opinion, the Court will treat both trusts indistinguishably and refer to them collectively as the "Trust."

7. *Id.* ¶ 43.

8. PX 3; Slip. ¶ 18.

no rental amount was ever inserted and no rent was ever paid.

Nor, insofar as the record shows, did the Trust engage in any trust activity after it was formed. Other than filing tax returns, the Trust had no financial records for any year other than 1988, or any checking or banking account; and it received no rent or other income from Timmons' use of the land.[9] In addition, although Kathryn was the Boatyard's bookkeeper, the Trust never took any action evidenced by a formal writing.[10]

## B. Kulp's Injury As A Boatyard Employee And The Litigation That Followed

The event that precipitated this lawsuit occurred on June 6, 1985, six months after the Trust was created. On that date, Timmons instructed Kulp, his employee, to remove a gas tank from a boat docked at the Boatyard. Timmons told Kulp that he (Timmons) had personally ventilated the tank, and that Jimmy would help Kulp remove it. In fact, however, the tank had not been emptied, and Kulp was left to perform that task alone. The tank exploded, and Kulp was severely injured: over one-third of his body was burned, requiring several skin grafts and leaving Kulp seriously scarred and disfigured. Timmons did not carry workers' compensation

insurance, and he did not reimburse any of Kulp's medical expenses. Consequently, on January 12, 1987, Kulp filed a petition for compensation due with the Industrial Accident Board ("IAB") under the Delaware Workers' Compensation Act.[11] Timmons defended on the ground that Kulp was not an "employee" of the Boatyard.

On July 15, 1988, the IAB determined that Kulp was an employee, as opposed to an independent contractor, as Timmons had contended. Thereafter, the IAB ordered Timmons to post a $150,000 bond and to pay Kulp's medical expenses, attorneys' fees, and temporary total disability benefits under 19 *Del. C.* § 2372(b).[12] Although Timmons could have used the cash being kept in the Boatyard safe to pay the bond, he refused.[13] To date, Timmons has never complied with the IAB order.

To compel the Timmons Boatyard to pay the IAB compensation award, the IAB filed a contempt petition in the Superior Court.[14] On June 18, 1990, that Court issued an order directing the Boatyard to show cause why it should not be held in contempt for failure to pay the IAB compensation award.[15] During that hearing, a question arose as to whether the IAB order directing "Timmons Boatyard" to pay the $150,000 bond was binding upon Kathryn, Timmons, and Jimmy as individuals.[16] The Superior Court remanded the

---

9. Stip. ¶¶ 25, 29–31.

10. Stip. ¶¶ 24, 30–31. Timmons explains his failure to produce any financial records for the Trust and Boatyard was the result of a robbery in the spring of 1996. In that robbery, Timmons says, all the Trust bookkeeping records and approximately $10,000 cash were stolen from the Boatyard safe. According to Timmons, the robbery was committed by his grandson, who spent all of the stolen money on "wine, women and song down at Ocean City." That explanation, however, cannot be reconciled with the fact that Timmons continued to have an amicable relationship with his

grandson, who never reimbursed Timmons or restored the documents.

11. *Id.* ¶¶ 34–37.

12. *Id.* ¶ 45.

13. *Id.* ¶¶ 41–42. Timmons continues to argue that Kulp was not an employee, but that issue has been finally adjudicated against him and cannot be collaterally attacked here.

14. *Id.* ¶ 46.

15. *Id.* ¶ 46.

16. *Id.*

case to the IAB to clarify that issue in July 1992. On remand, the IAB clarified that the intent of its prior order directing "Timmons Boatyard" to pay the bond was that Timmons, Jimmy and Kathryn were individually liable for that obligation.[17]

In July 1993, the Superior Court affirmed the IAB order holding the three Timmons defendants individually and collectively liable for Kulp's workers' compensation judgment.[18] In February 1994, the Supreme Court affirmed the Superior Court order, rendering final the IAB's determination that Kulp was an employee of the Boatyard within the meaning of the workers' compensation statute.[19]

In the interim, Timmons' son, Jimmy, died in October 1994, and Timmons' wife, Kathryn, died two years later. As a consequence, Timmons became the sole settlor, trustee, and lifetime beneficiary of the Trust.

Two years passed, and Kulp's IAB award still remained unpaid, which prompted the filing of a Superior Court proceeding to enforce payment of that award. On October 22, 1997, the Superior Court entered a money judgment in favor of Kulp, doubling the initial IAB award to $194,316.74 to compensate Kulp for the delay in payment. The Superior Court concluded, however, that it did not have the power to compel Timmons to pledge, sell, or encumber the assets held by the Trust to satisfy the judgment. In response to the Court's suggestion that

Kulp's remedy would lie in equity, Kulp brought this action in this Court for a determination that the Trust was invalid and that its assets were subject to execution process.[20]

Less than one month after this action was filed, Timmons conveyed all his personal property to his daughter-in-law, Beverly, and his granddaughter, Brandi. Thereafter, Beverly and Brandi conveyed a life estate in the conveyed property to Timmons. Timmons now argues that as a consequence of that conveyance, and the transfer of his (and his wife's) assets to the Trust in 1985, he has no assets from which to satisfy the judgment.[21]

On November 1, 1998, after Kulp's money judgment had become final, Timmons resigned as the trustee of the Trust, and appointed Beverly as the successor trustee.[22] That was but another stop in Timmons' pattern of hindering the legitimate claims of his creditors. Indeed in her deposition, Beverly admitted that the Timmons family had collectively agreed that they would never pay Kulp's IAB award. In Beverly's words, "We all said, 'Hell, no, I won't pay Mr. Kulp ... one red cent' at one point, according to the mood we were in."[23]

## II. THE ISSUES AND CONTENTIONS

These cross motions raise five core issues. The first is whether Kulp may reach

17. *Id.* ¶ 48.

18. *Timmons v. Kulp*, C.A. No. 92A–10–001, 92A–10–002, 1993 WL 331088 (Del.Super.Ct. Jul. 29, 1993), *aff'd*, 639 A.2d 74 (Del.1994).

19. 639 A.2d 74 (Del.1994); Stip. ¶¶ 52, 53, 58.

20. Stip. ¶¶ 54–60.

21. Stip. ¶¶ 60, 62–66; B. Timmons Dep. at 31 (testifying that Timmons gave "everything in

the world he owned" in return for her help in cooking and keeping house).

22. Stip. ¶¶ 67–68.

23. B. Timmons Dep. at 12–13, 40–41. As explained more fully elsewhere in this Opinion, Timmons' substitution of Beverly for himself as the trustee was without legal effect, since Kulp's claims against the Trust assets had been perfected long before the substitution.

the Trust assets as a creditor under 12 *Del. C.* § 3536, Delaware's spendthrift trust statute. Section 3536(a) provides that the assets of a spendthrift trust may be reached by creditors if (1) the trust instrument or Delaware law so provides or if (2) the trust was created to defraud creditors. Kulp argues that the evidence of record amply supports a finding of fraud. Timmons counters that no such finding can be made.

If Kulp cannot legally reach the Trust assets under Section 3536(a), a second issue arises, namely, whether the statute is the exclusive source of law for determining when Delaware spendthrift trusts may be voided as against creditors' claims. Kulp urges that even if the Court finds that the creation of the Trust does not come within the "fraud" exception to Section 3536(a), the Trust is nonetheless invalid under common law principles. Timmons argues that Section 3536(a) displaced all common law grounds other than fraud for invalidating a spendthrift trust, and that because none of the exceptions in Section 3536(a) authorizing invalidation are present here, Kulp has no basis to "pierce" the Trust.[24]

If Kulp's position (that the common law was not displaced by the spendthrift trust statute) is correct, the third issue becomes whether one or more of the recognized common law grounds for setting aside a spendthrift trust are established here.

The fourth issue is whether Kulp is entitled to an award of his attorneys' fees, on the ground that the Delaware Workers' Compensation Act mandates the defendant-employer pay the plaintiff-employee's legal costs if the employee is forced to litigate to receive a workers' compensation award. Lastly, the fifth issue is whether

(as Timmons contends) all of Kulp's claims are barred by the doctrine of laches.

Those issues are next addressed.

## III. ANALYSIS

■ As a general matter, creditors may not reach property held in a spendthrift trust to satisfy their claims against the beneficial owner.[25] That rule, however, is not absolute. As discussed below, the Timmons Trust assets can be reached by creditors under 12 *Del. C.* § 3536(a), because Timmons has not rebutted the presumption that the Trust was created to defraud his creditors. In addition, and independent of the statute, Kulp is entitled to reach the Trust assets because the Trust is also void under principles of Delaware common law.

### A. The Trust is Invalid Under The Statute As A Fraud On Creditors

■ The Court first considers whether the Trust is invalid under 12 *Del C.* § 3536, Delaware's spendthrift trust statute. For the reasons next discussed, I conclude that the Trust is statutorily invalid *ab initio*.

Section 3536(a) articulates the rights of creditors to reach assets held in spendthrift trusts as follows:

> The creditors of a beneficiary of a trust shall have only such rights against such beneficiary's interest in the trust property or the income therefrom as shall not be denied to them by the terms of the instrument creating or defining the trust or by the laws of this State. *If such beneficiary has transferred property to the trust in defraud of the beneficiary's creditors the foregoing shall in*

---

24. Timmons also argues that even if the Trust could otherwise be pierced, Kulp's action is barred by application of the equitable defense of laches.

25. *Dickinson v. Wilmington Trust Co.,* 734 A.2d 605, 610 (Del.Ch.1999).

*no way limit the rights of such creditors with respect to the property so transferred.*[26]

■ Thus, the statute expressly permits a trust to be invalidated if it is shown that the transfer of the property to the trust operated as a fraud on the beneficiary's creditors. If a fraud is shown, the trust is void, and a creditor of the beneficiary may reach its assets to satisfy the creditor's judgment claim.

Delaware courts have held that the test of a fraudulent conveyance of property involves a two-step analysis: first, a determination of whether the transfer was made for less than fair consideration; and second, a determination of whether the transferor was rendered insolvent as a result of the transfer.[27]

6 *Del. C.* § 1302, as it existed when the Trust was created in 1985, stated that a person is insolvent "when the fair salable value of his assets is less than the amount that will be required to pay his probable liability on his existing debts as they become absolute and matured." In this case, the absence of financial records and other documentation precludes the Court from determining, as an evidentiary matter, whether in fact Timmons was insolvent at the time of the asset transfer. Nor does the record evidence show whether the Boatyard was transferred to the Trust for fair consideration. All the record does show is that Timmons transferred the

Boatyard to a Trust controlled by himself, his wife, and his son.

■ Where, as here, a transfer of assets occurs between relatives, collusion is difficult to prove, and therefore "a rebuttable presumption of fraud arises."[28] That presumption requires the party asserting the validity of the transfer to show either that he was solvent after the transfer or that fair consideration was paid.[29] Timmons has not shown either, nor has he offered any evidence on either of those issues.

What evidence there is shows an intent to defraud past and future creditors. At the time the Trust was created, Cannon's IAB judgment was outstanding and Timmons had never paid it, even though he had the resources to do so. Moreover, the Trust served no discernable economic purpose. The Trust engaged in no recorded economic activity; no rent was paid to the Trust for the use of the Boatyard; and no formal action evidenced by a writing by the Trust was ever taken.

In short, Timmons has presented no evidence that rebuts the presumption that the creation and the transfer of, his (and his wife's) assets to, the Trust was a fraud. I conclude therefore that the Trust is invalid and has been from the outset, and must be set aside, on the basis of the fraud exception of Section 3536(a).

**26.** 12 *Del. C.* § 3536(a) (emphasis added).

**27.** *Tri–State Vehicle Leasing, Inc. v. Dutton,* 461 A.2d 1007, 1008 (Del.1983) (citing *United States v. West,* 299 F.Supp. 661, 665 (D.Del. 1969)); *see also* 6 *Del C.* § 1307 (West 1987) (providing that a conveyance made with actual intent "to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors"). 6 *Del C.* § 1304, which was enacted in 1996, sets forth eleven factors to be considered when deciding whether there has been "actual intent" to

defraud. Because that provision was enacted after the Trust was created in 1985, the Court will apply the statute that existed in 1985.

**28.** *Tri–State Vehicle Leasing, Inc.,* 461 A.2d at 1008; *see also Richards v. Jones,* 142 A. 832, 835 (Del.Ch.1928); *Hull v. Hudson,* 80 A. 674, 677 (Del.Ch.1911).

**29.** *Tri–State Vehicle Leasing, Inc.,* 461 A.2d at 1008 (citing *West,* 299 F.Supp. at 664–65); *Mitchell v. Wilmington Trust Co.,* 449 A.2d 1055, 1060 (Del.Ch.1982).

## B. Whether The Trust Is Void Under The Common Law

### 1. *12 Del. C. § 3536 Did Not Displace The Common Law Rules For Voiding A Trust*

In addition to, and apart from, the statute, the Trust is void because the statute does not displace the applicable principles of common law, and because under those principles the Trust is void as well.[30] That conclusion flows from the plain language of Section 3536, which affords the creditors of a trust beneficiary "such rights against such beneficiary's interest in the trust ... as shall not be denied to them by the instrument creating or defining the trust *or by the laws of this State*." [31] The "laws of this State" include the common law.[32] Timmons has not shown that the General Assembly intended to displace the common law when it enacted Section 3536.[33] Indeed, the cases decided after the enactment of Section 3536 evidence a contrary intent, because they resolved issues of the validity of spendthrift trusts on the basis of common law doctrines.[34] If, in fact, the statute had displaced the common law, that analytical approach would have been impermissible.

### 2. *The Trust Is Void Under Common Law Principles*

The Delaware case law has not delineated in any comprehensive "bright line" fashion the universe of common law grounds upon which a trust can be invalidated and made subject to claims of the beneficiary's creditors. Nor do I undertake to do that here. The decisions do, however, clearly reflect a basic principle: our courts will not give effect to a spendthrift trust that has no economic reality and whose only function is to enable the settlor to control and enjoy the trust property without limitations or restraints, as was done before the trust was created.[35]

Apart from cases involving fraud, that principle has found expression under at least two different doctrines. Some cases express that result in terms of public policy. In such cases, our courts have denied effect to a trust agreement provision that prohibits the beneficiary's alienation of trust income or assets, where the beneficiary is also the settlor.[36] Where, as here, the settlor or trustee is also the beneficiary, the spendthrift trust will be invalidated, because "[p]ublic policy does not permit one to create a spendthrift trust with his own property for his own benefit." [37] That is because where (as

---

**30.** *Provident Trust Co. v. Banks,* 9 A.2d 260, 261 (Del.Ch.1939).

**31.** 12 *Del. C.* § 3536(a) (emphasis added).

**32.** *Makin v. Mack,* 336 A.2d 230, 234–35 (Del. Ch.1975).

**33.** *Security Trust Co. v. Sharp,* 77 A.2d 543, 545 (Del.Ch.1950) ("[I]n light of the common law applicable to the settlor-beneficiary situation when the statute was passed (1933), the statute should not be held applicable to the settlor-beneficiary trust interests."). It is well established that the common law is the rule of this State, unless changed by an act of the General Assembly. *Makin,* 336 A.2d at 234. When interpreting statutory language, unless clearly indicated by express terms or by necessary implication from the statutory language, the common law is intended to apply, and a deviation from common law principles is sanctioned only where it is clear that the General Assembly's intent was to exclude these traditional principles. *Id.*

**34.** *See, e.g., Security Trust Co.,* 77 A.2d at 546; *Wilmington Trust v. Carpenter,* 75 A.2d 815, 819 (Del.Ch.1950); *Tracey v. Franklin,* 67 A.2d 56, 61 (Del.Ch.1949); *Provident Trust Co.,* 9 A.2d at 262.

**35.** *Security Trust Co.,* 77 A.2d at 545; *see also Restatement (Second) of Trusts* § 156(1) (1959).

**36.** *Wilmington Trust Co. v. Carpenter,* 75 A.2d 815, 819 (Del.Ch.1950).

**37.** *Security Trust Co.,* 77 A.2d at 545. The purpose of a spendthrift trust is to "protect its

here) the trustee controls the assets and income of the trust for his own benefit, unconstrained by any fiduciary duties owed to others, the purpose of a spendthrift trust—to protect the beneficiary from his or her own improvidence—is lost.[38]

The evidence of record—undisputed by Timmons—amply supports the conclusion that at all times Timmons had—and exercised—the power to use the Trust assets as his own. The Trust instruments authorize Timmons to expend the entire corpus of the Trust at his discretion, for his own benefit and without any limitation or restriction. Timmons acknowledged that after he conveyed the property to the Trust he expected to continue to use the land as he had in the past. Timmons also admitted that he did not believe the Trust limited in any way his ability to rent the property to someone else.

Further supportive of the invalidity of the Trust on public policy grounds is the fact that the Trust has no economic reality and from the outset was a sham. The record is bare of any evidence of any formal action, evidenced by a writing, taken by the trustees. No substantive financial records for the Trust were ever produced.[39] Most telling is the fact that the mortgage payments were made from Tim-

mons' *personal* income (not from Trust assets), and the income from boat maintenance and repairs was reported as income to Timmons *personally,* rather than as income to the Trust.[40] That shows that Timmons never intended for the Trust to have any economic function other than as a vehicle to avoid paying his debts. On this basis alone, the Trust is void and the Trust assets are subject to Kulp's claim as a judgment creditor.

▮▮▮▮ Other cases reach and express the same result under the doctrine of merger. Under that doctrine, a trust becomes void where the interests of the beneficiaries and the interests of the settlors are identical.[41] Timmons, Kathryn, and their son, Jimmy, were the initial settlors and Trust beneficiaries. Before they created the Trust, Timmons and Kathryn were the co-owners of the Trust property. Creating the Trust did nothing to change their ability to use that property however they chose. Upon Jimmy and Kathryn's death in 1994 and 1996, respectively, Timmons became the sole trustee of the Trust and its only beneficiary.[42] Because Kathryn and Timmons were mutual settlors and reciprocal beneficiaries of the same Trust, and because Timmons later became—and is now—the only beneficial in-

beneficiaries ... from themselves." *Tracey v. Franklin,* 61 A.2d 780, 785 (Del.Ch.1948), *aff'd,* 67 A.2d 56 (Del.1949). Such trusts are, in essence, "gifts" to the beneficiary and voluntary creditors have no legal right to access these funds in satisfaction of debts. It would therefore be illogical and perverse to give legal effect to a settlor's "gift" where the settlor is making a gift to himself to avoid his obligations to creditors. This Court has previously found that, "the law does not permit [the beneficial owner] to use the trust to escape the burdens of ownership, so the courts do not hold him to his self-imposed restraint on his own property." *Security Trust,* 77 A.2d at 545; *see also Arizona Bank v. Morris,* 6 Ariz.App. 566, 435 P.2d 73, 76 (1967) (holding that "any trust settled for the benefit of

the settlor is invalid notwithstanding the lack of fraudulent intent on the part of the settlor").

**38.** *Tracey,* 67 A.2d at 61; *Security Trust Co.,* 77 A.2d at 543–44.

**39.** Stip. ¶¶ 25–31; *see also* B. Timmons Dep. at 34.

**40.** Stip. ¶¶ 25–30, 61.

**41.** *Equitable Trust Co. v. Snader,* 154 A. 15 (Del.Ch.1931); *Provident Trust,* 9 A.2d at 261; *Security Trust,* 77 A.2d at 545.

**42.** Stip. ¶¶ 54, 58.

terest holder, the interests of the trustee and beneficiary are one and the same and have merged.[43] On that basis as well, the Trust is void and its assets are subject to the claims of Timmons' creditors.

 Timmons counters that even under the doctrine of merger Kulp cannot reach the Trust assets, unless he can show that his claims are either for "necessary" services rendered to the beneficiary, or for services performed to preserve the beneficiary's interests. That argument fails for two reasons. First, Timmons' narrow reading of the merger doctrine finds no support in the case law. If the Trust is invalid under the merger doctrine, the Trust assets become subject to the claims of *all* of the beneficiary's creditors, not just the narrow class of creditors that Timmons advocates. Second, even if Timmons' narrow definition of "creditor" were the law of Delaware, Kulp would prevail because he was found to have been injured while in the scope of his employment with Timmons. From this it would follow that Kulp's claim arose out of services that he was performing "for the preservation of [Timmons'] interests."

On all of these grounds, the Trust is void under the principles of Delaware common law, and Kulp may reach the Trust's assets to satisfy his judgment claim.

## D. Kulp Will Be Awarded His Attorneys' Fees

 The fourth issue is whether Kulp is entitled to attorneys' fees. Section 1113(c) of the Workers' Compensation Act provides that whenever an employee is forced to litigate to enforce payment of a workers' compensation award, the judgment *shall* include an award for the costs of the action and reasonable attorneys' fees.[44] Accordingly, Kulp has established his entitlement under the statute to an award of all the attorneys' fees he has incurred to date to obtain, and then collect, his judgment.

## E. Timmons' Defense Of Laches Is Without Merit

 The final issue is whether Kulp's claims are time-barred. Timmons claims that this action is barred by the equitable defense of laches because Kulp waited over fifteen years to bring this claim. That argument has no merit. To maintain a defense of laches, Timmons must demonstrate that Kulp (1) knew or should have known of his rights or claim; (2) unreasonably delayed in asserting his rights or claim; and that (3) Timmons was prejudiced by Kulp's delay in asserting his claim.[45] Here, Kulp did not Tail to assert his claim in a timely fashion. Because of Timmons' unremitting determination to

---

**43.** The fact that Timmons substituted Beverly for himself in 1998 is of no legal significance for at least two reasons. First, insofar as the Trust is void under the statute, it was invalid from the time of its creation. Second, insofar as the Trust is void under the doctrine of merger, it became void, at the very latest, after Kathryn and Jimmy's death. In either case, Kulp's right to seek recovery against Trust assets was perfected before and cannot be defeated by the substitution of Beverly as trustee.

**44.** 19 *Del. C.* § 1113(c) ("Any judgment entered for a plaintiff in an action brought under this section shall include an award for the costs of the action, the necessary costs of prosecution and reasonable attorney's fees, all to be paid by the defendant.").

**45.** *Gotham Partners v. Hallwood Realty Partners, L.P.*, 714 A.2d 96, 105 (Del.Ch.1998); *see also Restatement (Second) of Trusts*, § 147 cmt. c (stating that a creditor cannot reach a beneficiary's interest until he has attempted to satisfy this claim through legal avenues, unless such attempts would be fruitless).

oppose Kulp's claims, it took twelve years before Kulp could obtain a final judgment at law. Once that judgment was obtained, Kulp proceeded with diligence to enforce it in this Court. Moreover, Timmons has not shown how he was in any way prejudiced by the delay that was occasioned by his contumacious refusal to pay his lawful obligations. The defense of laches is unavailable.

## IV. CONCLUSION

For the reasons stated above, Kulp's motion for summary judgment is granted and Timmons' cross motion is denied. Counsel shall confer and submit an order implementing the rulings made in this Opinion.